|  | UNITED STATES DISTRICT COURT<br>DISTRICT OF PUERTO RICO |  |
|---|---|---|
| JOAQUIN RIVERA-NAZARIO, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA (Veterans Administration),<br><br>    Defendant. | | Civil No. 14-1634 (JAF) |

**CONCISE MEMORANDUM FOR ORDER OF DISMISSAL**

In Puerto Rico, as in many jurisdictions, in order to prevail on a medical malpractice claim, "a party must establish (1) the duty owed; (2) an act or omission transgressing that duty; and (3) a sufficient causal nexus between the breach and the harm." *Marcano Rivera v. Turabo Med. Ctr.*, 415 F.3d 162, 167 (1st Cir. 2005) (citation omitted). In the context of medical malpractice actions, the Puerto Rico Supreme Court has explained that a physician's duty is "to offer his or her patient that medical care, attention, skill, and protection that, in the light of the modern means of communication and education, and pursuant to the current status of scientific knowledge and medical practice, meets the professional requirements generally acknowledged by the medical profession." *Santiago Otero v. Méndez*, 1994 P.R.–Eng. 909,224, 1994 WL 909224 (1994). To prevail, a plaintiff must prove by a preponderance of the evidence both that the standard of care was not met, and that the failure to meet an acceptable standard caused the harm. *Id.* In order to determine the applicable standard of care in a medical malpractice action and to make a judgment on causation, a trier of fact will generally

need the assistance of expert testimony. *Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 113 (1st Cir. 2010); *see also Rojas–Ithier v. Sociedad Española de Auxilio Mutuo y Beneficencia de P.R.*, 394 F.3d 40, 43 (1st Cir. 2005) (citing *Rolon–Alvarado v. Municipality of San Juan*, 1 F.3d 74, 78 (1st Cir.1993); *Lama v. Borras*, 16 F.3d 473, 478 (1st Cir.1994)).

This Federal Torts Claim Act medical malpractice claim is against the Veterans Administration Hospital of Puerto Rico. It involves a 66-year-old veteran who had a recurrent inguinal hernia since at least 2003, was submitted to surgery on September 7, 2012, to correct the recurrent inguinal defect, and later developed an infection that required the removal of a testicle. The following timeline is material to these findings.

On May 19, 2011, surgery was carried out on Plaintiff Joaquín Rivera-Nazario to treat the latest recurrence of a right inguinal hernia which dated back to around 2003. It was an indirect hernia, meaning that a portion of the intestines or abdominal fatty tissues had protruded along the pathway made by the testicles during fetal development when they descended from the abdomen into the scrotum. Plaintiff fully recovered without any complications.

On June 25, 2012, a general surgery consultation was made because Mr. Rivera presented once again with a large recurrent hernia on the right side. Consent was obtained for a hernia repair.

On September 7, 2012, the large direct right inguinal hernia was this time repaired laparoscopically with mesh. The Board-Certified general surgeon was Dr. Mariluz Rivera-Hernández (hereinafter, Dr. Rivera). A direct hernia does not involve protrusion

into the pathway to the scrotum left by the testicles in the development of the fetus but forms due to weakness in the abdominal tissue. This is very important to understand the eventual scrotal problem that occurred. The defect was repaired with mesh because of the fragility of the lower abdominal wall and fasciae. The mesh reinforces the weak tissue to hopefully avoid or retard a recurrence. He was discharged on September 8, 2012, without known complications or hernia recurrence. Plaintiff gave informed consent of all possible complications out of a recurrent hernia repair, including the loss of a testicle.

A Foley catheter placed at the time of surgery was withdrawn in the Urology Clinic on September 10, 2012. On that date, no extraordinary adverse finding was documented on the chart. Plaintiff was on his way to recovery at home.

On September 28, 2012, Plaintiff visited the Surgical Clinic. While Mr. Rivera felt well and was recovering satisfactorily from his recent surgery, the surgeon who saw him, Dr. José Sorrentino-Brunisholz (hereinafter, Dr. Sorrentino) noted the apparent occurrence of another hernia which extended into the right hemi-scrotum. A CT-Scan was ordered, but not on an urgent basis. It was scheduled for October 29, 2012. Dr. Sorrentino also discussed with Mr. Rivera the possibility that, as a result of all those recurrences, he might lose a testicle because of his health status and the previous surgeries.

On October 29, 2012, the CT-Scan was performed as scheduled. It was originally read as indicating another large inguinal hernia with a large right hydrocele (a collection of fluid around the testes). The great weight of the credible evidence confirms that the "delay" in performing the CT-Scan was not a notable dereliction in care. There was no

need to perform the CT-Scan on an emergency basis so that immediate treatment could have been administered. The standard of care regarding collection of fluid around the testes is to give it time for the body to absorb the fluid as part of the healing process. Expectancy, that is, waiting for the body to react, is the norm. For that reason, the CT-Scan did not have to be performed on a stat or expedited basis.

Once the CT-Scan was available, Dr. Mariluz Rivera, the general surgeon, and Dr. Elizabeth Perazza, the staff urologist, met with the radiologist, Dr. José Rivera, to together look over the CT-Scan. They determined, on November 2, 2012, that, upon further review, there was no new hernia. Moreover, there was no connection between the repairs made during the recent surgery and the scrotal symptoms Plaintiff was reporting. As stated, the CT-Scan was not needed on an emergency basis but was simply indicated for future diagnostic purposes.

Even if there was an early recurrence of a hernia or a scrotal lesion, it is the surgical standard of care to wait at least eight weeks, and sometimes a bit longer, following an operation before carrying out a subsequent procedure. This is due to the time needed for inflammation to subside and for the mesh used to incorporate into the body. Additional surgery done too soon makes dissection more difficult, increases the chance of damage to other structures, and raises the possibility of contaminating the mesh. Further, even placement of a drain for a hydrocele or hematoma is also not indicated in the presence of a recently-placed mesh. If there is indication to drain a hematoma or hydrocele, it would have needed to be done within forty-eight to seventy-two hours of formation. Otherwise, the blood cakes up and drainage is not possible.

1  During the first forty-eight to seventy-two hours post-surgery, there seemed to be no
2  complaint that could indicate immediate drainage. And, Plaintiff did not inform
3  Defendant of a possible hematoma or hydrocele until long after it had formed and the
4  Defendant could have successfully drained it.

5      It is also well recognized in surgery that pseudo-hernia recurrences with scrotal
6  swelling is fairly common post-operatively. The standard of care is still to be
7  conservative in treatment. About 90% of cases of swelling in the area of the former
8  hernia or a scrotal hematoma resolve in from six to eight weeks without further
9  intervention. In Mr. Rivera's case, that did not happen.

10     On January 25, 2013, Plaintiff visited the clinic at the VA Hospital with a request
11 regarding his sexual life and complaining to urologist Dr. Elizabeth Perazza that the large
12 right scrotal mass that had been observed in September was deviating his penis and made
13 sex with his wife impossible. The emphasis placed by Plaintiff was not on the mass itself,
14 but rather on the deviation of the penis, which he wanted to correct to improve his sexual
15 performance. He sought treatment for it. An ultrasound of the scrotum showed a large
16 complex extra-testicular structure that probably was a hydrocele. A hydrocele is a totally
17 benign condition. He opted and consented to exploration of his right scrotum with
18 removal of the mass, and was informed once again, and he specifically accepted, that the
19 surgery might require removal of the right testicle of complications arose.

20     On February 5, 2013, Dr. Perazza explored the veteran's right scrotum. No hernia
21 was present, but a cystic lesion was removed and sent for pathologic review. Dr. Mariluz
22 Rivera, the general surgeon, assisted in the procedure. She noted no connection between

the cystic mass and the repaired inguinal hernia. Dr. Perazza described the veteran's testicles as being atrophic, a condition related to the multiple interventions which place stress on that reproductive part of the body. Each time there is inguinal hernia or surgery in the scrotal area, the surgery compromises the blood circulation to the scrotum and testicles, and the testicles can be damaged by atrophy.

On February 12, 2013, Plaintiff visited the Urology Clinic. On this one-week follow up, Dr. Perazza found the veteran doing well, though there was the expected scrotal edema (swelling). Thirty-seven days went by and, on March 14, 2013, Plaintiff visited the Emergency Room. Mr. Rivera presented right scrotal swelling, along with redness and pain. Pus was draining from the site and he informed that the pus had been first noticed about <u>nine days before</u> he came to the clinic. An abscess was diagnosed. Dr. Perazza, the urologist, incised and drained the abscess and described the wound as "dirty and infected." Cultures showed the presence of several types of bacteria. Dr. Perazza noted at trial that there appeared to be a connection between the infection and poor hygiene, because bacteria of fecal origin were present in the cultures made from the scrotal area. A prescription for antibiotics was also given.

By March 18, 2013, and despite the drainage procedure carried out on March 14, 2013, and the provision of antibiotics, purulent drainage persisted from the wound. Dr. Perazza operated on an emergency basis to perform another scrotal exploration, during which she removed a necrotic ovoid lesion. She also removed the right testicle and placed a percutaneous cystostomy (a tube through the skin into the bladder) for the elimination of urine. On March 19, 2013, Dr. Perazza reported the wound was healing

well. The cystostomy tube was removed on March 21, 2013, with the wound continuing to heal.

The use of the cystostomy tube was needed to drain urine to avoid further contamination of the infected scrotal region. The decision was made during the procedure when necrotic tissue was found and it proved impossible to identify either the right testicle or the right spermatic cord. The literature favors the use of a supra-pubic cystostomy to manage scrotal necrotizing conditions such as Mr. Rivera had. The use of a temporary cystostomy is more comfortable to the patient and easier to care for by the nursing staff. It also avoids the use of a Foley catheter, which can also cause further infection.

The testicle was removed because Mr. Rivera had three prior hernia repairs that had compromised the vascularity of the testicle and the same was necrotic. Plaintiff had been made aware of this, and he knew that this complication could happen.

On April 16, 2013, Plaintiff visited the Urology Clinic. Dr. Perazza saw Mr. Rivera and noted he once more had a right-sided hernia, though the scrotal wound was healed and was not red or swollen. Mr. Rivera nevertheless said he felt well and that he was able to have sex with his wife (stated in Spanish in the note). A male with one testicle can perform sexually.

Finally, on May 15, 2013, Mr. Rivera was admitted once again for his final recurrent hernia repair. Two large pieces of mesh were used to cover the defect. He was discharged home the next day in good condition. Those who have recurrent hernias tend to have more complications than those who only undergo an original repair.

When Plaintiff visited the Surgery Outpatient Clinic on May 31, 2013, Mr. Rivera reported he was doing well after the latest surgery, except for some problems urinating which suggested a urinary tract infection. He was treated for the presumed infection.

Plaintiff was seen again on December 13, 2013, at the Primary Care Unit of the Community Based Outpatient Clinic, in Ceiba, Puerto Rico. Mr. Rivera told his provider that he felt fine and reported no acute complaints. He stated he was very active and exercised by walking on a routine basis without any problem. As of late May 2013, there were no further hernia complaints.

Plaintiff complains that he lost the testicle because of delays in treatment and CT-Scan imaging. Plaintiff claims compensation in the amount of $6 Million to make him whole. The credible evidence produced by Defendant and its Board-certified surgeon, urologist, radiologist, and expert witness, clearly established that the unfortunate complications suffered by Plaintiff were not the product of negligent or delayed medical care.

The patient was given the best treatment possible and the alleged delay between interventions only deferred to the need to grant time for the body to heal and for inflammation to subside. Mesh had been used to repair the hernia and the best medical practice was to give it time to heal on its own. This is of primary importance to avoid possible infection or damage to the mesh and its absorption as part of the tissue.

Plaintiff was not a healthy man. He suffered from many complications, all of which affect the healing process. His general health has been compromised by a number of conditions, such as depressive disorder, chronic obstructive pulmonary disease, asthma

attacks, hypothyroidism, hypertension, hyperlipidemia, and benign prostate disease. These conditions, according to Defendant's expert witness, have significant deleterious effect on the healing processes in tissues. Defendant's expert witness reported that these conditions cause repeated strain on abdominal muscles and fasciae due to labored breathing and difficulty urinating.  Also, they compromise vital blood flow and oxygenation, cell metabolism, and body defenses against infection.  The very occurrence of repeated hernia repairs gradually deteriorate the abdominal tissues and fasciae, as well as blood circulation in the structures of the spermatic cords and testicles.

Plaintiff failed to establish by credible and preponderant evidence that the Veterans Administration physicians failed to offer Plaintiff the proper medical care, attention, skill, and protection in light of modern means of scientific medical knowledge. Plaintiff was a risk patient.  He was made aware of that on several occasions.  His credibility was tarnished when he totally exaggerated the claim that he became suicidal on account of his suffering. The medical records belie that because, even with all the complications he suffered, on occasion after occasion he reported to physicians and nurses feeling quite well under the circumstances.

Plaintiff did not have an expert at trial. The court admitted, at his request, a report by a Doctor José L. Cerra, rendered on November 4, 2013, confirming the long history of hernias since 2003.  Dr. Cerra is now deceased, but his report is against the great weight of the credible, unimpeached evidence offered by the attending Board-Certified surgeon, the attending Board-Certified urologist, the attending Board-Certified radiologist, and the Board-Certified expert urologist, who is still a professor at the School of Medicine of the

University of Puerto Rico. It consists basically of Monday-morning quarterbacking, that is, a listing of reasons to justify after the fact some sort of deviation from a standard of care that Dr. Cerra failed to establish.

Unfortunate as Plaintiff's complications were, there is no credible evidence, as a matter of fact no preponderant evidence, that the standard of care described by the treating physicians, Defendant's expert, and documented in the medical chart was not the correct one to follow.

On account of the above, the court will enter a judgment of dismissal on the complaint filed by Plaintiffs.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 16th day of September, 2015.

<u>S/José Antonio Fusté</u>
JOSE ANTONIO FUSTE
U. S. DISTRICT JUDGE